IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHAUNTAY M. CANNON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner for | : | |
| Social Security | : | NO. 23-229 |

**O P I N I O N**

SCOTT W. REIDDATE:  January 9, 2024
UNITED STATES MAGISTRATE JUDGE

Chauntay M. Cannon brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  She has filed a Request for Review to which the Commissioner has responded.  As explained below, I conclude that the Request for Review should be denied and judgment entered in favor of the Commissioner.

I.*Factual and Procedural Background*

Cannon was born on November 24, 1973.  Record at 288.  She indicated in her Disability Report that she completed two years of college, but elsewhere has stated that she only obtained a GED.  Record at 310, 747, 757.  She has worked in the past as a home healthcare aide, bartender, and retail salesclerk.  Record at 310.

On November 3, 2020, Cannon applied for benefits, alleging disability since January 20, 2019, on the basis of back pain, a knee replacement, and "muscle shutdown."  Record at 288, 309.  She later amended her onset date to February 18, 2020.  Record at 45.  Her applications were denied initially and upon reconsideration.  Record at 115, 116, 163, 164.  Cannon then requested a hearing *de novo* before an Administrative Law Judge ("ALJ").  Record at 209.

A hearing was held in this case on October 5, 2021.  Record at 41.  On October 14, 2021, however, the ALJ issued a written decision denying benefits.  Record at 15.  The Appeals Council denied Cannon's request for review on November 22, 2022, permitting the ALJ's decision to stand as the final decision of the Commissioner of Social Security.  Record at 1.  Cannon then filed this action.

II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985).  Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision.  *Richardson v. Perales*, *supra*, at 401.  A reviewing court must also ensure that the ALJ applied the proper legal standards.  *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  42 U.S.C. §423(d)(1).  Each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.  (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.  (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record.  *Id*.  The RFC assessment reflects the most an individual can still do, despite any limitations.  SSR 96-8p.

The final two steps of the sequential evaluation then follow:

> (iv)  At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.  (v)  At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make the adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.    *The ALJ's Decision and the Claimant's Request for Review*

In her decision, the ALJ found that Cannon suffered from the severe impairments of lumbar disc disease, osteoarthritis of the knees, obesity, depression, anxiety, and post-traumatic stress disorder.  Record at 18.  She did not find "muscle shutdown" to be a medically determinable impairment, but recognized that Cannon was referring to a result of her partial knee replacement, and considered it in the context of the osteoarthritis in her knees.  Id.

The ALJ did not find that any of Cannon's severe impairments, or any combination of impairments, met or medically equaled a listed impairment.  Record at 19.  However, as to Cannon's non-exertional impairments, the ALJ found that she had moderate limitations in the ability to understand, remember or apply information; moderate limitations in interacting with others; moderate limitations in concentration or persistence; and mild limitations adapting or managing herself.  Record at 22.

The ALJ concluded that Cannon retained the RFC to engage in sedentary work requiring only occasional pushing and pulling with the legs; no climbing of ropes, ladders, or scaffolds; frequent balancing; performance of all other postural activities no more than occasionally; and only simple, repetitive tasks with only occasional changes in the work setting and occasional contact with the public and coworkers.  Record at 23.  In accordance with the testimony of a vocational expert who appeared at the hearing, the ALJ found that, although Cannon could not return to her prior relevant work, she could work in such jobs as a weight tester, nut sorter, or assembler.  Record at 35.  She concluded, therefore, that Cannon was not disabled.  *Id*.

In her Request for Review, Cannon does not dispute the ALJ's conclusions regarding her exertional limitations.  She argues, however, that the ALJ erred in rejecting certain work-preclusive findings of independent consulting mental health expert, Kristen Mulray, Psy. D.

IV.   *Discussion*

   A.   *The ALJ's Consideration of Dr. Mulray's Evidence*

Dr. Mulray met with Cannon on January 29, 2021.  Record at 747.  In a Medical Source Statement check-off form, she indicated that Cannon was markedly limited in her ability to interact appropriately with the public, and in the ability to respond appropriately to normal work situations and to changes in a routine work setting.  Record at 753.

The ALJ declined to credit Dr. Mulray's findings of marked limitations, writing:

> Dr. Mulray overly relied upon the claimant's subjective allegations.  This level of impairment is not supported by the generally mild results of the consultative examination or the conservative, routine and minimal mental health treatment records.  For example, the record does not adequately support the marked limit in responding appropriately to work situations and changes in a work setting.  The claimant remained able to go to necessary places such as doctors' offices and grocery stores, despite reports of agoraphobia.  The claimant alleged multiple limitations with activities of daily living, but she blamed her alleged physical limitations.

Record at 32.

4

Cannon argues that the ALJ's evaluation of Dr. Mulray's opinions was not in accordance with the present SSA regulations, which require her to evaluate the persuasiveness of a medical opinion by considering primarily its internal supportability and its consistency with other evidence. 20 C.F.R. §404.1520c(b).

In fact, however, the ALJ did consider the degree to which the findings of marked limitations in the Medical Source Statement were supported by Dr. Mulray's own observations in her written report, writing that they were "not supported by the generally mild results of the consultative examination." *Id*. The ALJ wrote that, according to Dr. Mulray's report, Cannon's "mental status examination was unremarkable other than mildly impaired attention and concentration and recent and remote memory skills." Record at 31.

The ALJ's summary of Dr. Mulray's report was accurate. In her report, Dr. Mulray observed that Cannon had lethargic motor activity, but was cooperative and fully oriented, with appropriate dress, grooming, posture, and eye contact. Record at 749-750. She had an "adequate" manner of relating and overall presentation. Record at 750. Although Dr. Mulray noted Cannon's mood and affect to be depressed, her thought processes were coherent and goal directed with no evidence of paranoia, delusions or hallucinations. Record at 749. Her intellectual functioning was average. Record at 750. Her attention, concentration, and memory were only mildly limited. *Id*. She drove herself to the examination. *Id*.

Thus, the ALJ adequately explained her conclusion that nothing Dr. Mulray observed in the consultative examination – her single meeting with Cannon – supported her finding of marked limitations in her social interactions, or ability to respond to normal situations. In this context, a "marked limitation" is one where functioning in the area is "seriously limited." Record at 752.

The ALJ went on to write that Dr. Mulray's finding of marked limitations was inconsistent with Cannon's "conservative, routine, and minimal mental health treatment records." Record at 32. This, too, was a fairly accurate observation. Cannon told her mental health provider that she was hospitalized for psychiatric treatment in 2009. Record at 727, 747. Also, she was arrested in 2019 and convicted of a summary offense against her landlord, which could indicate mental instability. Record at 749. Nevertheless, there is no record of hospitalizations, emergency room visits, or partial hospitalizations since 2009, and certainly not within the relevant period.

As the ALJ also accurately reported, "mental health records from January 31, 2019, reveal that the claimant was sleeping six to nine hours per night, had improved mood, had no nightmares for about a month, still experienced some hypervigilance, [but] had improved appetite and 'okay' concentration, and did not have anhedonia, hallucinations or suicidal or homicidal ideation." Record at 30, 400-403.

The ALJ further noted that, in an intake assessment for mental health treatment dated February 27, 2020, Cannon was said to be depressed, but had a neat appearance, normal motor behavior, appropriate though labile affect, normal speech, unremarkable thought content, normal thought processes and perception, full orientation, fair memory, good concentration and good judgment and insight. Record at 30, 395-6.

Cannon argues that the ALJ wrongly found her treatment to be "minimal" without accounting for a gap in treatment caused by a lack of insurance beginning on September 12, 2019. Record at 553 (pain clinic note from Penn Medicine). This is clearly untrue, since Cannon was once again insured in February, 2020, but did not resume mental health treatment until October, 2021. Record at 47, 393.

Nevertheless, at the hearing, Cannon's representative told the ALJ that the gap in treatment was due to COVID-related difficulties in obtaining mental health services. Record at 47. According to him, the facility where Cannon was assessed in February, 2020, shut down services shortly thereafter. *Id*. The ALJ failed to mention this. In this sense, then, it is possible to conclude that the ALJ erred in failing to recognize a plausible explanation for the gap in Cannon's treatment. Nevertheless, it could also be noted that, during the two years Cannon was without mental health treatment (for whatever reason) she had no hospitalizations, mental health-related emergency room visits, contact with the legal system, or any other sign of mental decompensation. Thus, the ALJ was essentially correct in calling her treatment "minimal."

The ALJ also accurately pointed out that, despite Cannon telling Dr. Mulray that she had an "intense fear" of leaving her home, there is no evidence of this. As the ALJ noted, Cannon stated in her Function Report that her problems interacting with others were caused by "pain and/or sleepiness," and not a fear of leaving her home. Record at 25, 320 ("I don't deal with people. I can be irritable and short. People get offended. I don't do it purposely – either I'm in pain or I'm sleepy").

Further, Cannon wrote in her Function Report that she could drive independently to "short trips close to home," limited only by her physical disorders. Record at 319. She routinely went grocery shopping and to the laundromat. Record at 318, 319. The record does not reflect that Cannon had any emotional trouble attending her numerous physical therapy sessions, or medical appointments. This is the basis for the ALJ's observation in her rejection of Dr. Mulray's findings, that: "The claimant remained able to go to necessary places such as doctors' offices and grocery stores." Record at 32.

Clearly, therefore, the ALJ adequately considered both the supportability and the consistency of Dr. Mulray's findings of marked mental limitations. Substantial evidence supported her conclusions. The fact that she did not specifically separate her discussion of Dr. Mulray's findings into a "supported" section and a "consistent" section is therefore irrelevant.

B.  *Other Relevant Evidence of Record*

Although the role of this Court is to review the ALJ's decision as it is written, record evidence not included by the ALJ in her decision is also relevant to this Court's determination as to whether the evidence relied upon by the ALJ was representative of the record as a whole. In this case, the ALJ's rejection of Dr. Mulray's finding of extreme limitations was clearly supported by the record as a whole, even that to which she did not cite.

Initially, it is surely significant that, when Cannon completed a Disability Report on November 3, 2020, she did not mention having any mental illness; she listed as her medical conditions only chronic back pain, knee replacement, and muscle shutdown. Record at 309.

Further, when Cannon was asked in her Function Report, dated December 10, 2020, how her conditions limited her ability to work, her response in its entirety was:

> I am not able to sit or stand for long periods of time. I get back spasms randomly. The medication makes me very sleepy. I am not able to move about easily. My left knee buckles under. I am not able to lift, pull, push over 5 lbs. without pain. Bad weather affects (worsens) my pain (rain/cold).

Record at 316. She did not complain of any psychological limitation. As noted above, Cannon attributed her social isolation to sleepiness and pain, and she also responded to a question in the Function Report as to her ability to "go places": "I don't go places because I can't sit or stand long." Record at 320.

Also notable is a quote from Cannon's hearing. When her attorney asked her: "Do you have any difficulties with other people, getting along with other people or leaving your home, interacting with the public, any problems interacting with other people?", Cannon answered at some length, without mentioning agoraphobia or any other mental barrier to leaving her house or interacting with others:

> I don't really talk to a lot, people don't understand when you have certain, when you deal with certain things people don't – they don't understand, people are not patient enough. Besides, and it's not for them to be, you know. Life is moving you know, and when you are slower, you're slow, and you can't like kind of keep up, you know, people are, and it's hard to get along with people when they don't see you, you know. They just want move, move, move, and you can't move, move, move, so it's annoying to them.

Record at 59. This clearly undermines Dr. Mulray's findings of extreme mental limitations.

C.      *Thorpe v. Kijakazi*

Finally, Cannon argues that, in *Thorpe v. Kijakazi*, Civ. A. No. 22-3995, 2023 WL 5152306 (E.D. Pa. Aug. 10, 2023), a judge in the Eastern District of Pennsylvania held that "reading the decision 'as a whole'" did not substitute for an ALJ's discussion of consistency and supportability with respect to any medical report he rejected. She reads *Thorpe* to mean that the Commissioner wrongly "justified the ALJ's decision by re-summarizing the medical evidence already summarized by the ALJ in her decision." Reply Memorandum at 2.

Cannon has misread *Thorpe*. In *Thorpe*, the judge found that the ALJ "fail[ed] to identify any support for her conclusions" in her decision. 2023 WL 5152306 at *12. She then criticized the Commissioner's response for attempting to fix this weakness by "canvassing the record" for evidence to "fill in the gaps" in the defective ALJ decision. Here, by contrast, the ALJ identified ample support for her conclusions, as discussed above. The Commissioner did nothing wrong in restating in her response the medical evidence cited by the ALJ, for the purpose of showing that the ALJ adequately supported her decision.

9

Thus, even if *Thorpe* were binding on this Court, which it is not, it is factually distinct from this case. Accordingly, it is not relevant here.

V.      *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be DENIED, and judgment entered in favor of the Commissioner.

BY THE COURT:

*/s/ Scott W. Reid*
_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE